**Maryann KNESS, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 4:10–CV–66 RP–RAW.**

United States District Court,
S.D. Iowa,
Central Division.

Dec. 30, 2010.

Richard L. Richards, U.S. Attorneys Office Des Moines, IA, for Defendant.

Gail Lynn Barnett, Gretchen R. Jensen, Max Schott & Associates P.C., Des Moines, IA, Plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Chief Judge.

Plaintiff, Maryann Knees, filed a Complaint in this Court on February 16, 2010, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

At the outset of the administrative decision, it was noted that prior applications had been filed and that the ALJ declined to reopen them. Tr. at 11. This Court does not have jurisdiction to review that portion of the decision. *Califano v. Sanders,* 430 U.S. 99, 107–08, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977).

Plaintiff filed her current applications on October 11, 2006. Tr. at 174–78 & 179–82. After the applications were denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held June 17, 2009, before Hon. Marilyn Hamilton (ALJ). Tr. at 29–64. The ALJ issued a Notice of Decision—Unfavorable on September 21, 2009. Tr. at 8–22. The Appeals Council declined to review the ALJ's decision on December 11, 2009. Tr. at 2–4. This judicial review proceeding followed.

The ALJ noted that Plaintiff is last insured for Title II benefits at the end of September, 2006. Tr. at 13. At the first step of the sequential evaluation, the ALJ concluded that Plaintiff had not worked continuously since the alleged onset of disability—January 1, 2004—and that the sequential evaluation would proceed, but that work activity during that period "is an indication of involvement in a range of daily activity not consistent with disability from all work." At the second step of the

sequential evaluation, the ALJ found Plaintiff's severe impairments to be bilateral carpal tunnel syndrome and depression. At the third step it was found that Plaintiff's severe impairments do not meet or equal the requirements of any impairments which would qualify for an award of benefits without further consideration. Tr. at 14.

At the fourth step, the ALJ wrote:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except she can only occasionally climb. Additionally, she has some limitation handling and fingering bilaterally, as she can do these only rarely to occasionally, such that she would need to avoid highly repetitious or forceful use of her hands bilaterally. Further, the claimant should avoid concentrated exposure to extreme cold as well as hazards such as moving machinery and unguarded heights; she should only rarely use tools including vibrating/power tools; there should be no driving required on the job. In addition, the claimant is limited to only simple, routine, repetitive work at no more than a regular pace, with only occasional contact with coworkers and the public and only occasional supervision.

Tr. at 15–16. Given that residual functional capacity, the ALJ found that Plaintiff is unable to do any of her past relevant work. Tr. at 20. At the fifth step of the sequential evaluation, the ALJ found that jobs exist in significant numbers which Plaintiff is able to do in her impaired condition. Tr. at 21. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 22.

## MEDICAL & VOCATIONAL EVIDENCE

The record in this case consists of two volumes. The first volume contains administrative documents from her various applications. The second volume contains hand written treatment notes from clinics at which Plaintiff received periodic treatment. None of the physicians or other medical professionals rendered an opinion on Plaintiff's ability to work, and none were asked to do so. At the hearing, after the testimony of the claimant and witnesses, the ALJ told Plaintiff she would be sent for a consultative mental health evaluation. The report of that evaluation is the last document in the record and will be discussed below.

Between September 2, 2004 and November 30, 2005, Plaintiff was treated for depression and other maladies at Mercy Medical Clinics in Des Moines, Iowa. Tr. at 322–41 & 400–21. Plaintiff was seen for various illness at Mercy Clinics in Indianola, Iowa between September 24, 2004, and December 1, 2005. Tr. at 425–44. Long-term medications were listed as Risperdal[1], Abilify[2], Cymbalta[3] and Xanax[4]. Tr. at 426.

On October 22, 2004, Plaintiff was seen at Behavioral Health Resources of Central Iowa, a part of Eyerly–Ball Mental Health

1. A medication indicated for the treatment of conditions such as bipolar disorder. Physicians' Desk Reference.

2. A medication indicated for the treatment of conditions such as schizophrenia, bipolar disorder and major depressive disorder. Physicians' Desk Reference.

3. A medication indicated for the treatment of major depressive disorder and generalized anxiety disorder. Physicians' Desk Reference.

4. An anti-anxiety medication. *See, e.g. McGee v. Astrue,* 291 Fed.Appx. 783, 784 (8th Cir. 2008).

Services. Plaintiff sought help to cope with various problems such as custody of her children, staying away from illegal drugs, moods, and migraine headaches. Plaintiff said she wanted to "stay sober, decrease depression and irritability, and not fight so much with [her] husband." Tr. at 371. Thereafter, Plaintiff was seen at the clinic numerous times through February 24, 2006. The notes are hand written, and no purpose would be served by summarizing each entry. Tr. at 342–76.

On November 9, 2006, Plaintiff's treating psychiatrist, Michael J. Taylor, M.D., completed a document entitled Documentation of Mental Disability for Disability Determination Services Bureau. This form is not a "check list," rather it is a list of domains to which the doctor is asked to respond with narrative answers. Dr. Taylor opined that Plaintiff would not have any difficulties remembering and understanding instructions, procedures, and locations. The doctor wrote that Plaintiff has "some difficulty" in the areas of concentration and attention and completing tasks "at times." He wrote that Plaintiff doesn't appear to have major difficulties interacting with others, although she sometimes gets irritable. The doctor wrote that Plaintiff has "some difficulties" using good judgment. He said that the struggle with many changes in her life has led to an increase in symptoms of depression. Tr. at 466. The doctor noted that Plaintiff was beginning to have increased anxiety about driving and being in the car when others are driving, but was "unclear as to the nature of this increased difficulty." Tr. at 467. The Court has read all of the treatment notes dated November 12, 2004 through January 23, 2007. Tr. at 464–510. Plaintiff was seen by Dr. Taylor for depression, and counseled to assist her to cope with difficulties such as the termination of her parental rights, divorce, and other family and personal problems.

On April 11, 2007, Plaintiff was seen for a consultative physical examination by Danice F. Klimek, M.D. Tr. at 524–29. Plaintiff reported that she was diagnosed with bilateral carpal tunnel syndrome in 2006, but was not being followed by a doctor for that condition. Plaintiff reported pain, numbness, tingling, cramping and swelling in both hands but especially the right hand. She said that any type of activity "especially typing, writing, gripping, grasping and repetitive motion" aggravated the pain, and that her hands will go numb even if she is just sitting. Tr. at 524. On physical examination, " ... the wrists and hands were symmetric. The fingers could be opposed. Grip strenghts were 5/5 on the left and 4/5 on the right. She did complain of pain with range of motion of the wright wrist. Phalen's test was positive on the right, negative on the left. Tinel's test was positive in the median nerve distribution on the right, negative on the left." After the examination, Dr. Klimek opined that Plaintiff is limited to lifting between 20 and 25 pounds from floor to waist, waist to shoulder, and over the shoulder. The same restrictions were given for pushing, pulling and carrying. The doctor wrote that because of the carpal tunnel syndrome, Plaintiff should avoid highly repetitive or highly forceful activities. Tr. at 527.

As noted above, Plaintiff was seen for a psychological evaluation on July 13, 2009, by Randal David Reynolds, Ph.D. Tr. at 586–95. Plaintiff told Dr. Reynolds she applied for disability due to her depression and because of carpal tunnel. The doctor stated that she appeared to put forth adequate effort on the tests, but that the MMPI–II assessment showed validity problems associated with "faking bad." Tr. at 586. Plaintiff told Dr. Reynolds that she had been hospitalized in 2009, after she attempted to jump out of a mov-

ing car. Tr. at 587. The record of that hospitalization does not appear in the record before the Court, but it was referred to in an Eyerly–Ball treatment note dated April 5, 2009. "The client states that she started feeling claustrophobic and tried to jump out of the car she was riding in, and was kicking at the window and had to have 6 people to hold her down when she arrived at ILH." Tr. at 548. At the hearing, Plaintiff testified that she had tried to commit suicide and was hospitalized for three days. Tr. at 53.

Plaintiff reported two jobs to Dr. Reynolds. Six years before the evaluation, she worked for Tyson's Food in Arkansas. She said she quit that job because of stress. She said she had a job for two days, directing traffic around a construction site. That job, also was too stressful.

On mental status examination, Plaintiff described symptoms supporting the diagnosis of a mood disorder. The psychologist noted multiple sources supporting the diagnosis of major depressive disorder. Tr. at 587.

After the administration of the WAIS–IV, a full scale IQ of 85 was reported. While neither verbal IQ nor performance IQ scales are reported, the doctor wrote that the tests "indicate relative and normative weaknesses in verbal comprehension and processing speed abilities. In contrast, she shows relative strengths in perceptual reasoning working memory (specifically, auditory memory as discussed in the WSM–III section below)." Tr. at 588.

Discussing the "fake bad" data of the MMPI–II, Dr. Reynolds wrote:

> We can easily imagine someone under the circumstances of attempting to secure Social Security Disability benefits as willingly endorsing a range of psychological symptoms. At the same time, recent research suggests that individuals producing an elevated F scale often present with comparatively more chronic psychological issues than the typical outpatient individual. This feature may accurately reflect Jo's true psychological condition.

Nevertheless, Dr. Reynolds noted that Plaintiff's clinical scales "must be viewed as invalid." Tr. at 593.

On Axis I, the diagnoses were depressive disorder NOS, cocaine dependence in remission, nicotine dependence, and R/O impulse control disorder. On Axis II, the diagnosis was R/O personality disorder. Concluding his report, Dr. Reynolds wrote:

> The claimant was cooperative in the interview and with the assessment process, but test data show some evidence of exaggerating symptoms. With these issues in mind, my best estimate of this individual's actual functioning involves someone with low average intelligence and comparable adaptive functioning (despite the mother's report that Jo adaptively functions in the moderately low range). Jo shows weaknesses in verbal comprehension but does best with perceptual reasoning. Her memory function ranges from borderline to average. She does best with auditory stimuli. This individual presents with a history of depression and substance abuse. Clinical records do not mention impulse control issues, but her history would suggest consideration of this diagnostic classification. Beyond these Axis I disorders, the chronic history of mental health issues would also suggest consideration of some type of personalty disorder.
>
> The features likely combine to make employment difficult. She likely has difficulties accommodating herself to a new work setting. Learning new tasks may prove difficult, particularly because of poor verbal comprehension and memory

issues. She will do best with verbal instructions and probably works best with hands-on projects. Beyond all these issues, Jo likely lacks the psychological resources to keep herself engaged when things become difficult. She will likely show low frustration tolerance and poor self control. Her history suggests she tends to respond impulsively to immediate desires, which means if she does not feel like working she will not work. The claimant reports a history of interpersonal issues, including anger issues, another feature of her impulse control problem. Conflicts with others in the work environment seem quite likely.

Dr. Reynolds opined that prognosis for resolution of Plaintiff's psychological features was poor. Tr. at 594.

Plaintiff appeared at the hearing without counsel. Tr. at 36. Plaintiff testified that she completed the 8th grade in school, and that she dropped out because she was pregnant. Tr. at 38–39. She said she tried twice to obtain a GED but was unsuccessful. Tr. at 39. After hearing testimony about Plaintiff's past relevant work (Tr. at 41–19), the ALJ told the vocational expert that the only job she would consider to be past relevant work was a job done at Wal–Mart which was full time work and lasted about five months. Tr. at 47. The ALJ asked Plaintiff why she had begun so many jobs, but only lasted a short period of time at each one. Plaintiff responded that she was not able to get along with the other people at work.

Plaintiff told the ALJ that she had lost parental rights for her four children. She said one child was being raised by a grandmother. Tr. at 49. However, after the grandmother died, that child went to the home where the other three are. Plaintiff testified that she lost her parental rights because of drug usage, namely crack cocaine. Plaintiff said that she was no longer using illegal drugs, nor was she drinking alcohol. Tr. at 50. She said that except for one occasion, she had not used drugs since September 2004. She said that in 2005, she went through a drug treatment program which lasted five or six months and had not used drugs since then. Tr. at 51.

Plaintiff told the ALJ that she was advised that surgery would help her carpal tunnel syndrome, but she did not have insurance to cover it. She said that activities like writing, typing or carrying heavy things make her hands go numb. Tr. at 54.

Plaintiff's step father, William Weiss, testified that whenever Plaintiff tries to work, she gets fired for losing her temper and threatening anyone who aggravates her. Tr. at 55–56.

The ALJ called Elizabeth Albrecht to testify as a vocational expert. Tr. at 56. The ALJ asked the vocational expert to consider a hypothetical question:

> ... A hypothetical individual can do light work as defined in Social Security regulations in the Dictionary of Occupational Titles but has some additional non-exertional limitations as follows. The person is limited in only occasionally climbing ramps—well, occasionally climbing whether it be ramps, stairs, ropes, ladders, or scaffolds. The person has no other postural limits, however. The person has some limitations in handling and fingering bilaterally. They should only do this rarely to occasionally. And the person should avoid highly repetitious or highly forceful activities with the hands bilaterally. The person should avoid concentrated exposure to extreme cold and to hazards such as moving machinery and unguarded heights. The person should only rarely use tools such a—well, that would in-

clude vibratory tools such as power tools. There should be no driving as a requirement of the job. The person's able to do only simple, routine, repetitive work at no more than a regular pace, only occasional contact with the public and co-workers, only occasional supervision. Given these limitations, would the person be able to do any of the past relevant work.

Tr. at 58–59. The vocational expert responded that Plaintiff's past relevant work would be precluded. Tr. at 59. The vocational expert testified that given the restrictions of the hypothetical, "I only have one job that I can come up with that would be light, unskilled. A bakery worker on a conveyor line ..." The vocational expert admitted that the job was "kind of on the fringes" of the limits in the hypothetical. Tr. at 60. The vocational expert testified that if the inability to perform at a consistent pace were added into the hypothetical, all work would be precluded. Tr. at 61.

## DISCUSSION

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have

reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola* [*v. Astrue*], 480 F.3d [885] at 886 [ (8th Cir.2007) ] ). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) The substantial evidence on the record as a whole test requires a scrutinizing analysis which requires consideration of supporting as well as detracting evidence. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987), citing *Universal Camera Corp. v. National Labor Relations Bd.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

In her brief, Plaintiff first argues that the ALJ failed to meet the burden of establishing the existence of work which exists in significant numbers. Plaintiff also argues that the ALJ's hypothetical questions and the answers thereto were improper, and do not constitute substantial evidence to support a denial of benefits. Finally, Plaintiff argues that the ALJ erred by not finding that Plaintiff qualifies for benefits under § 12.05(c) of the listings of impairments.

Defendant, on the other hand argues that the Act, the regulations, and case law require the inability to engage in any substantial gainful activity, and that work exists in the national economy when there is a significant number of jobs in one or more occupations having the requirements which

the claimant is able to meet. The Commissioner cites 20 C.F.R. §§ 404.1566(b) and 416.966(b).

In *Jenkins v. Bowen,* 861 F.2d 1083 (8th Cir.1988), the past relevant work was that of a security guard. The ALJ found that Jenkins' residual functional capacity limited her to sedentary work and that the past relevant work was not possible. A vocational expert, however, testified that 500 security guard jobs existed in the region in which Jenkins lived. Based on that testimony, a decision of not disabled was rendered. On appeal, Jenkins argued that 500 instances of one job did not constitute a substantial number of jobs to justify a denial of benefits. The Court, quoting *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir.1988) wrote:

> A Judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

■ The Court held that Jenkins had unique skills, twenty-five years experience as a security guard, and was well-qualified to work as a security guard at the sedentary exertional level. Therefore, the Court wrote: "Accepting Jenkins' contention that only 500 jobs are available to her, we nevertheless believe that this number represents a significant number *under these circumstances.*" *Id.* (emphasis added). As will be shown below, substantial evidence in the record as a whole does not

support a finding that Plaintiff has the residual functional capacity to engage in substantial gainful activity, therefore the Court will not decide whether the job of bakery worker constitutes a "significant number" of jobs. However, under the circumstances of this case it is very doubtful that one job could be "significant."

■ In *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc), Circuit Judge Richard S. Arnold, writing for the Court, said that the most important issue in a disability case is the question of residual functional capacity. In this case, after hearing the testimony of Plaintiff and her step father, as well as that of the vocational expert, the ALJ sent Plaintiff for a consultative examination by Dr. Reynolds. In her decision, the ALJ wrote that she gave significant weight to Dr. Reynolds objective testing and "some weight to his opinions." Tr. at 18. It is well settled law that it is error for an ALJ to substitute his or her opinion for that of a physician. *See, e.g. Ness v. Sullivan,* 904 F.2d 432, 435 (8th Cir.1990): "... the ALJ ignored the law of this circuit, which states that the ALJ must not substitute his opinions of those of the physician. *See Fowler v. Bowen,* 866 F.2d 249, 252 (8th Cir.1989)."

As noted above, Dr. Reynolds opined that Plaintiff lacks the psychological resources to keep herself engaged in work activity because she has low frustration tolerance and poor self control. He stated that conflicts with others in the work environment seem quite likely. Furthermore, the psychologist opined that Plaintiff's prognosis for improvement was poor.

■ One cannot help but remember the admonition in *Rhines v. Harris,* 634 F.2d 1076, 1079 (8th Cir.1980): "Employers are concerned with substantial capacity, psychological stability, and steady attendance." Substantial evidence in this record

**900**

■ not support a finding that Plaintiff possesses any of those qualities. The Court in *Rhines* went on to state: "The Secretary need not find a specific job for a claimant. However, it must be shown that the claimant can realistically perform in existing employment." *Id.* quoting *Brinker v. Weinberger*, 522 F.2d at 16.

In the opinion of the Court, had the limitations on working presented by Dr. Reynolds been included in a hypothetical question, the vocational expert would have, no doubt, testified that all work is precluded. It must be remembered that given the hypothetical recited by the ALJ, the vocational expert was able to identify only one job, and that was "kind of on the fringes." When the inability to perform at a consistent pace was added, she said that work is precluded. Had the vocational expert been told of the limitations on Plaintiff's ability to interact with others, it is not a stretch to conclude that competitive work would have been ruled out.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D. Arkansas 1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The final decision of the Commissioner is reversed and the Commissioner is ordered to award Plaintiff the benefits to which she is entitled.

5.  N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the gov-

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406(b), and LR 54.2(b))[5]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

ernment in the case that the applicant alleges were not substantially justified."