Sandra Dee **BREWER–KITE,** Plaintiff,

v.

Carolyn W. **COLVIN**[1], Acting Commissioner of Social Security, Defendant.

No. 4:13–cv–40 RP–CFB.

United States District Court, S.D. Iowa, Central Division.

Aug. 13, 2013.

1. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin

Thomas A. Krause, Attorney at Law, Des Moines, IA, for Plaintiff.

Mary C. Luxa, Gary L. Hayward, AUSA, U.S. Attorney's Office, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Plaintiff, Sandra Dee Brewer–Kite, filed a Complaint in this Court on January 29, 2013, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for Title II benefits July 15, 2011. Tr. at 150. Plaintiff, whose date of birth is February 20, 1974, (Tr. at 150) was 38 years old (Tr. at 37) at the time of the hearing on August 9, 2012, before Administrative Law Judge JoAnn L. Draper (ALJ). Tr. at 30–63. The ALJ issued a Notice Of Decision—

should, therefore, be substituted for Michael J. Astrue as the Defendant in this suit. No further action need to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Unfavorable on August 24, 2012. Tr. at 13–25. The Appeals Council declined to review the ALJ's decision on December 18, 2012. Tr. at 1–6. Thereafter, Plaintiff commenced this action.

In her application, Plaintiff stated she became unable to work because of her disabling condition on July 7, 2011. Tr. at 150. At the first step of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity after the alleged onset of disability date. The ALJ wrote that work activity which had occurred after the onset date was an unsuccessful work attempt. At the second step, the ALJ found Plaintiff has the following severe impairments: bipolar disorder, cataplexy[2] (probable), depression and anxiety NOS, personality disorder with aggressive features and substance abuse. The ALJ found that none of these impairments, alone or in combination, were severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 18. At the fourth step, the ALJ found

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except she can lift and carry 50 pounds or more occasionally and she can frequently lift up to 25 pounds. She can stand and walk six hours out of an eight hour day. She can tolerate occasional exposure to extreme cold and extreme pulmonary irritants. She can never climb ladders, ropes or scaffolds. She is precluded from performing highly detailed complex job tasks. She is precluded from interacting with the general public. She can tolerate occasional interaction with co-workers and supervisors such that her

interaction would be short lived, brief and superficial. She is limited to tasks learned in 30 days or less with no more than simple work related decisions and occasional work place changes.

Tr. at 20. The ALJ found that Plaintiff is unable to perform her past relevant work. Tr. at 23. At the fifth step, the ALJ found that Plaintiff is able to do a significant number of jobs, examples of which include laundry folder, industrial cleaner, and final assembler of optical frames. Tr. at 24. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 25.

## EVIDENCE REVIEW

On March 21, 2010, Plaintiff was seen at Broadlawns Medical Center Emergency Department requesting a tetanus shot after she had been bitten and had a bottle broke over her head during a bar fight. Tr. at 267. Plaintiff complained of headache and tail bone pain. Tr. at 268.

Plaintiff was seen at Broadlawns on April 22, 2010, for a followup of a thyroid condition and to refill her medications. Tr. at 394–96. Diagnoses included acute bronchitis, fatigue, generalized anxiety disorder, hypothyroidism, nicotine dependence and obesity. Tr. at 395–96.

On July 4, 2010, Plaintiff was seen at the emergency room at Broadlawns because of right sided tooth pain. Tr. at 274. The nurse wrote that Plaintiff immediately became confrontational and demanded to see Dr. Coppola. The nurse wanted to begin I.V. therapy because she was concerned about infection in Plaintiff's blood stream. Plaintiff said she wanted antibiotics and that she wanted to leave. Plaintiff asked about the possibility of going to the University of Iowa and the nurse offered the

---

**2.** A transient attack of extreme generalized weakness, often precipitated by an emotional response, such as surprise, fear, or anger; one component of the narcolepsy quadrad. Stedman's Medical Dictionary, 27th Edition.

operator's number. The more the nurse offered assistance, the angrier Plaintiff became and at one point threatened to "take it to another level." Tr. at 275.

Plaintiff was seen at the University of Iowa Hospitals and Clinics on July 8, 2010, for her dental care where she underwent extraction of some of her teeth under sedation due to severe dental anxiety. Tr. at 332–43.

When Plaintiff was seen at Broadlawns on July 20, 2010, for thyroid check, it was noted that she was to return to the University of Iowa for follow up of her dental care. Tr. at 391.

On December 30, 2010, Plaintiff was seen at Broadlawns at which time the chief complaint was: "Pt here for med ck and both legs swelling and has a lump in rt thigh. She thinks her Lexapro is not working. Gets bad pains in her wrist and knees hurt. Lt knee gets sharp pains in it." Tr. at 388. Plaintiff's medications were adjusted—dosage of Lexapro was increased, and Prednisone was discontinued. Tr. at 390.

On January 4, 2011, Plaintiff went to Broadlawns because of low back pain. Tr. at 385–87. The diagnosis was paravertebral muscle spasm, and Plaintiff was given a prescription for Flexeril. Plaintiff was also instructed to use ice and heat, and given a note stating when she could return to work. Tr. at 387.

Plaintiff was seen at Broadlawns on March 2, 2011, with a chief complaint of "Pt here to ck out her heart." Tr. at 376. An EKG showed sinus rhythm with no acute changes. Diagnoses included non-cardiac chest pain. Tr. at 378.

On June 9, 2011, Plaintiff saw Kisik Kim, M.D., for an outpatient psychiatric evaluation at Broadlawns Medical Center. Dr. Kim noted that Plaintiff's history included two hospitalizations at the Broadlawns mental health unit in 1993 and 1994, for extreme irritability and impulse control disorder. Plaintiff told the doctor that her children live with their father, and that she lives alone with two pit bull dogs. Dr. Kim wrote:

> The patient seems extremely irritable, tense, and ready to explode, literally explode. She does not require much provocation. She yells, screams out, and she has to go outside the office and return, but patient apologized and indicated that she has, in fact, difficulty in controlling her anger. At home, the pit bulls seem to sense when she is angry and this is the reason her children are away with their father.

On psychiatric examination, Plaintiff was flushed and extremely tense. Her speech was coherent and relevant but her mood was labile and she became extremely frustrated. Insight, judgment and impulse control were noted to be poor and the doctor wrote that Plaintiff had an extremely low anxiety tolerance. On Axis I the doctor diagnosed mood disorder and impulse control disorder, not otherwise specified. Tr. at 453. On Axis II the diagnosis was personality disorder the passive-aggresive features. The doctor opined that the global assessment of functioning, both current and for the past year, was 40[3]. Tr. at 454.

---

**3.** The Global Assessment of Functioning (GAF) rates doctor's opinion of a patient's ability to function on a scale of 0 (inadequate information) to 100 (superior functioning). A rating between 31 and 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgement, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children is defiant at home, and is failing at school). Diagnostic and Statistical Manual of Mental Disorders Fourth Edition Text Revision (DSM–IV–TR) at 34.

On June 15, 2011, Plaintiff was seen at Broadlawns emergency room because she had passed out while moving furniture. Plaintiff noted one episode of syncope a year before. Tr. at 309. Plaintiff was instructed to return to the emergency room immediately if her symptoms worsen or if new symptoms developed. Tr. at 314. Plaintiff returned to the emergency room on June 16, 2011 with complaints of dizziness, and ringing in her ears. Plaintiff said that she fell, and that she got dizzy when she stood up. Tr. at 302.

A Broadlawns History and Physical report dictated on June 23, 2011, states that while Plaintiff was waiting for an appointment in primary care, she reported that she felt dizzy. Hospital staff brought a wheel chair and as soon as Plaintiff sat down, she lost consciousness for about three seconds. Afterwards, Plaintiff complained of headache, confusion, some chest pain and difficulty breathing. Plaintiff reported that she had blackout spells for years, usually precipitated by dizziness. "She also states she feels 'paralyzed' just prior to this where she can hear voices around her but she just cannot move." Plaintiff said there was never any shaking, tongue biting or loss of bowel or bladder control. Plaintiff said that the frequency of the spells had been increasing over the previous week. It was noted that Plaintiff had received an aortic valve ring in 1997. Tr. at 324. Plaintiff was admitted to the hospital for overnight cardiac monitoring, but the doctor opined that it was possible that the spell could have a psychogenic versus an arrhythmogenic etiology. Tr. at 326. Overnight monitoring did not reveal any cardiac changes. The doctor wrote: "Perhaps related to anxiety disorder with panic attacks. Aggressive psychiatric treatment as outpatient." Plaintiff was scheduled to see a psychiatrist the following week. Tr. at 327.

Plaintiff underwent a psychiatric consultation during the hospitalization on June 24, 2011. It was noted that Plaintiff was being followed in an outpatient setting for mood disorder, impulse control disorder, and personality disorder with passive-aggressive features. Plaintiff also reported being diagnosed with bipolar disorder, anxiety and PTSD. Plaintiff said that she had bouts of loss of consciousness for the previous year and a half. She said that sometimes the spells happen during intense anger, but the previous day she was calm when it occurred. Plaintiff said that her children live with their father because of her blackout spells, but it was noted that the medical chart indicated it was because of her anger outbursts. Plaintiff said she was able to work despite her anger, and that her medication controls the anger when she takes it. "When I take my pills, I do not have anger." Tr. at 328. Plaintiff had one psychiatric appointment with Dr. Kim, but was not satisfied because she was unable to understand the doctor's English. An appointment had been scheduled with Dr. Singh, and Plaintiff said she had been told she would have no problem understanding Dr. Singh's English. Tr. at 329. On Axis I, the diagnosis was bipolar disorder not otherwise specified. On Axis II, the diagnosis was personality disorder with aggressive features by history. Tr. at 330.

Plaintiff saw Manmohan Singh, M.D., on June 29, 2011. Tr. at 397–98. On mental status examination: "She seems hypomanic but not presenting with clear mania or psychosis. Does report a long history of anxiety, depression and denies any thoughts of self-harm.... She admits to having anger outburst. She has some insight regarding her problem with impaired judgment." Tr. at 397. On Axis I, the diagnosis was bipolar disorder, not otherwise specified. On Axis II, the diagnosis was personality disorder with passive ag-

gressive features. The doctor and Plaintiff discussed both medication management as well as ways to develop coping skills and stress management. Plaintiff noted a pending appointment with a therapist, and asked to return to see Dr. Singh in a month. Tr. at 398.

On July 7, 2011, Plaintiff was seen at Broadlawns Medical Center complaining of left-sided chest pain which radiates up into her shoulder. It was noted that Plaintiff had been seen for bronchitis on June 20, 2011, but had not filled the prescriptions given her at that time. It was also noted that Plaintiff's syncopal episodes had been getting worse over the previous few weeks. Listed on Plaintiff's past medical history, among other things, were, depression, impulse control disorder, passive-aggressive personality disorder, bipolar disorder, anxiety, and post-traumatic stress disorder. Tr. at 371.

On July 7 and 8, 2011, Plaintiff was seen by Joss D. Fernandez, M.D. at the University of Iowa Hospitals and Clinics for syncope. Tr. at 343. Plaintiff reported that the first time she had an episode of passing out was Mother's Day 2010. Since that time, she said, the spells were becoming more frequent. The episodes were triggered by exertion—even mild exertion—and by anxiety, yelling or stress. There was no warning signs, and there was no evidence of abnormal body movement or seizure activity. She simply becomes limp, loses all muscle tone and falls to the ground. Plaintiff said that she can feel and see everything, but cannot interact with anyone or speak. She said it takes about 20 minutes to feel normal, and that she has headaches after the spells. The assessment was "likely cataplexy" and a sleep study was recommended followed by an appointment with a sleep physician. Tr. at 344. On July 8, 2011, Neurologist Pedro Gonzalez–Alegre, M.D. wrote:

Sandra D. Brewer–Kite is an 37 y.o. female who presents for consultation . . . for episodes where she loses function of her muscles. The first episode happened in May 2010. She gets worked [up] (anxious/upset) then will get dizzy (lightheaded) and then will fall to the floor or chair. For the next 5–30 minutes she will be unable to respond to those around her, but can see and understand what they say. She did not have another episode until Mid June 2010. The week prior to this episode was diagnosed with "bipolar disorder" as she cannot control her [anger]. She was started on Klonopin, trazodone and Lexapro. She notes she was taking Lexapro before this and the dose was actually decreased to 10 mg a day, rather than 30 a day. The first episode occurred while she was gardening and upset that her children were not helping her. Since then she has had 5–7 more episodes. Each episode is proceeded by being "pissed off" and sometime includes physical activity (running late for an appointment or working outside). During these episodes she does not shake, loose bowel or bladder control and does not bite her tongue. She realizes she has lost time when the episode is over. She may have chest pain before or after an episode. She may have right posterior head pressure and tingling. She denies having a headache afterwards. She will have to move slowly or else she may have another episode. She notes she may have multiple episodes a day and multiple days without episodes. She denies any associations with taking medications, but notes she has had more since her medication changes last month. Prior to these medication changes she did not sleep well. Since taking these medications, she sleeps much better, does not need to take naps during the day, and may even have con-

versations with people while asleep and not be aware of the conversation. Tr. at 353–54.

On July 15, 2011, Plaintiff saw Kevin Carroll, LMFT, CADC at Broadlawns psychiatric and addiction medicine clinic. Mr. Carroll wrote: "... Listened to Sandy vent and cry. Sandy cussed frequently and used harsh language. She states she prefers counselors who are direct and give feed back." Mr. Carroll wrote that the goal of the treatment plan, when it was developed, would be to "reduce stress, as this is a major trigger for other health issues (which are preventing her from work and driving)." Tr. at 448.

On August 2, 2011, Plaintiff saw Wendy A. Waldman, M.D., in the Neurology Clinic at Broadlawns Medical Center. The doctor wrote that she had reviewed the records from the University of Iowa. The doctor wrote: "She has episodes almost daily. If she gets anxious or upset or angry she will suddenly lose muscle tone, fall to the floor." Dr. Waldman prescribed Xyrem and instructed Plaintiff how to take the medication. Tr. at 365.

On August 4, 2011, Plaintiff saw Dr. Singh. Tr. at 444. The doctor noted that before he saw Plaintiff, she became very upset in the waiting room, and then had an attack during which she slept for 30 minutes. Tr. at 445.

On August 5, 2011, Plaintiff saw Christopher R. Matson, D.O. at Broadlawns Medical Center, Primary Care Clinic. The purpose of the visit was to establish new care. The doctor noted that Plaintiff did not fill out a patient questionnaire/history as new patients generally do. The doctor also noted that when he entered the exam room, Plaintiff wrote down the time, and she said she is keeping notes because she keeps getting "screwed over." Tr. at 361.

On August 19, 2011, Plaintiff saw Dr. Singh. She told the doctor that she was having a good day, and that her days were either happy or rage. Tr. at 443.

Plaintiff saw Mr. Carroll on August 26, 2011. Tr. at 439–42. Plaintiff presented herself "... as very upset, angry and full of rage. She is upset with her ex-husband because he has not been following through with their son's medication/health. Sandy was tearful, loud, pointing her finger and slammed the desk. Pt has follow up in Iowa City on Monday to determine if she can return to work. Meets with Dr. Singh next week too." Tr. at 339.

On August 31, 2011, the director of public Safety and communications at Broadlawns Medical Center wrote to Plaintiff to advise her that because of "conflicts/negative interactions with" health care providers at the Primary Care Clinic Plaintiff was being asked to seek future health care services at the walk-in clinic and the hospital's emergency department. Tr. at 250.

On September 8, 2011, Plaintiff was mailed a letter from a patient and volunteer relations coordinator at Broadlawns Medical Center, in Des Moines, Iowa in response to Plaintiff's request to be assigned a provider who would see Plaintiff within a 48 hour time frame. The hospital was not able to comply with that request due to provider staffing. Plaintiff was encouraged to go to her provider for treatment of her chronic medical issues, and to the Walk–in–Clinic for more urgent care. It was also noted that due to Plaintiff's concerns, the Medical Center was looking for a new provider for Plaintiff. Tr. at 249.

Plaintiff saw Dr. Singh on September 6, 2011. Tr. at 436–38. Plaintiff reported being off her medication pending a sleep study at the University of Iowa. She also reported being let go from her job. Tr. at 437. Plaintiff saw Mr. Carroll on September 9, 2011, at which time a comprehensive assessment was finished. Tr. at 435.

On October 12, 2011, Plaintiff was seen at Broadlawns Medical Center, Methodist IMED Clinic to establish care. Plaintiff's primary complaint was her unresponsive episodes. It was noted that she had such an episode in the waiting room. Plaintiff reported that with one exception, the spells are triggered by emotional stress and/or anxiety, and are preceded by light-headedness and vertiginous symptoms. Plaintiff said that during the spells, she does not lose consciousness and is able to hear, see and feel what is happening but is unable to get her muscles to respond. Typical spells last 30 seconds to 2 minutes, but she said they had lasted as long as 20 minutes. Tr. at 412. Christopher Kaup, M.D., opined that the spells were not cataplexic, but that they were "primarily psychiatric in nature." He wrote that the spells might be complicated by sleep apnea and polypharmacy. The doctor wrote that there was likely not much that could be done from a medical standpoint other than addressing the sleep apnea and minimizing sedating medications. The doctor noted that Plaintiff was to be fitted with a CPAP mask at the University of Iowa. Tr. at 415.

On October 21, 2011, Plaintiff told Mr. Carroll that she had collapsed at work, after which she had not been called to return. She had no money and her living arrangement would end on November 1. She had no plans, and her youngest son had returned to her care. Mr. Carroll wrote that he gave Plaintiff multiple resources which she could contact. Tr. at 434.

On October 28, 2011, Plaintiff told Mr. Carroll that she was pursuing his leads including the Broadlawns Case Management. She applied for unemployment benefits. Plaintiff reported drinking and using marijuana one day, and "multiple instances of getting mad, frustrated, angry, yelling, 'pissed off', including once pulling a pellet gun on someone." Tr. at 433.

Plaintiff saw Dr. Singh on November 1, 2011. Tr. at 430–32. She saw Mr. Carroll on November 11, 2011. Short term goals included reducing angry outbursts and threats to others. Tr. at 429.

Plaintiff saw Dr. Kaup on November 16, 2011. She reported having 3 spells since seeing him on October 12. The spells had been triggered by anxiety or other emotional stress. Tr. at 407. After his examination, Dr. Kaup diagnosed somatiform disorder, with a low suspicion for cardiovascular syncopal episodes. The doctor noted a pending cardiology evaluation. The doctor wrote: "Suspect this is primarily a psychologic phenomen, and discussed best addressed through counseling and psychiatrist." The doctor also noted that Plaintiff had been using a CPAP for two days and she was tolerating it well. Tr. at 409.

On December 13, 2011, a senior special agent with Federal Protective Services wrote to Plaintiff to advise her that "further threatening and/or disruptive behavior, i.e., communications containing any real or implied threats, disruptive behavior, or misconduct against the personal safety of employees of Social Security Administration or any other individual is unwarranted, unwelcome, and potentially violates Federal law and regulation." Plaintiff was instructed to cease and desist further such behavior. Tr. at 251.

On December 14, 2011, Plaintiff was seen by the Broadlawns Medical Center Crisis Team because of a desire to die. Plaintiff came to the hospital with her aunt. Plaintiff was noted to be agitated and tearful, stating: "I'm tired of fighting." She said she wanted to go to sleep and be with her deceased mother and father. Plaintiff declined to verbalize a plan. Plaintiff reported the visit from Homeland Security the day before, and she denied that she had made any threats but was

**1184**

told that if she did, she would be arrested on felony charges. Plaintiff reported a suicidal history when she was 13 years old. On mental status exam, it was noted that Plaintiff appeared disheveled, had limited eye contact, displayed guarded behavior. Tr. at 470. Plaintiff did not appear to be intoxicated. Her judgment was listed as impaired. Insight was poor. Her affect was labile, mood was depressed and anxious, and her thought process was disorganized. Plaintiff was admitted to the Broadlawns mental health unit. Tr. at 471.

On December 15, 2011, Plaintiff was seen by Janice A. Landy, M.D. Plaintiff reported having suicidal thoughts over the previous three weeks. Stressors included being unable to work, loss of her home and loss of custody of her children to her ex-husband. The doctor wrote:

> Patient also indicates that she is trying to obtain Social Security, and when talking with a representative from the Social Security office, she apparently talked about her symptoms and mentioned that she becomes aggressive at times. The Social Security worker apparently perceived this as a threat, and the patient was visited by Homeland Security on the day prior to admission. Her aunt was able to corroborate her story that she was not meaning to threaten anyone, and the patient states that the security officers made her sign some paperwork but there does not appear to be any ongoing investigation. Even so, the patient indicates that at that point she felt she could no longer go on living.

Tr. at 464. In addition to monthly suicidal ideation, Plaintiff said that she engages in self injurious behavior, i.e. cutting herself. On questioning by the doctor, Plaintiff

"reached under her pillow and handed over a broken set of plastic ware to the physician, indicating that she was thinking about cutting herself in the hospital." Two previous suicide attempts were noted, the last being in 1993. On mental status examination Plaintiff's mood and affect were noted to be highly irritable. On Axis I, the diagnoses were bipolar affective disorder, NOS; and, marijuana abuse. On Axis II the doctor diagnosed likely cluster B personality disorder [4]. Tr. at 465. Plaintiff discharged herself from the hospital on December 17, 2011, against medical advice. Tr. at 516–17.

On December 19, 2011, Plaintiff saw Dr. Singh. Plaintiff said that Dr. Landy had prescribed Seroquel, but that she was not given any medication because of signing out against medical advice. Dr. Singh prescribed Seroquel as well as continuing the prescriptions for Lexapro and Klonopin. Tr. at 459. Plaintiff saw Mr. Carroll on December 23, 2011. Tr. at 457.

On January 5, 2012, Plaintiff saw Eva Christiansen, Ph.D. for a psychological evaluation. Tr. at 486–90. Under the heading Behavioral Observations, Dr. Christiansen wrote: "Her affect was nervous; she became abrasive and demanding. Moods are likely to be readily irritable, depressed, or anxious. Speech was comprehensible if loud and peppered with profanity." Plaintiff told Dr. Christiansen that she had a variety of work—waitress, administrative secretary, banking, warehouse, auto parts. Her longest job as a "third-party actuary" lasted four years. When asked why she left the job, Plaintiff responded: "mental breakdown because of the divorce from my husband. I ended up going to jail for terrorism." Nevertheless,

---

**4.** Cluster B includes the antisocial, borderline, histrionic, and narcissistic personality disorders. Individuals with these disorders often appear dramatic, emotional, or erratic.

Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM–IV–TR) at 685.

she said that the job ended while she was off work under the Family and Medical Leave Act. While she was on leave, the company was sold and her employment terminated. Plaintiff said she had never been fired because of her behavior. Tr. at 487. On Axis I, Dr. Christiansen diagnosed: bipolar disorder, NOS; anxiety disorder, NOS; and, cannabis abuse. On Axis II, the doctor diagnosed borderline personality disorder the traits of which "were especially prominent in her presentation." Tr. at 489. Dr. Christiansen opined that although Plaintiff had the ability to remember and understand instructions and procedures,

[t]here are multiple possible sources of interferences with her performing adequately at any level, with mood disorder, anxiety, stress, substances use, and personality disorder conditions likely. Attention and concentration appeared distractible by subjectively pressing issues. Pace may be uneven. Relationships to others have often been marked by negative emotional exchanges, frequently with verbal hostility and occasionally with threats of physical violence. Judgment may be short-sighted. She has the ability to adjust to changes in the environment.

Tr. at 489–90.

Plaintiff was seen at Broadlawns on January 6, 2012, after having sprained her ankle. Tr. at 513–15. When Plaintiff saw Dr. Kaup on January 25, 2012, the swelling in her ankle had improved. Tr. at 508. On February 17, 2012, Plaintiff was seen at Broadlawns because of pain in her right shoulder. Plaintiff told the doctor she had injured it two weeks prior during an altercation with her "god children," ages 12 and 9. Tr. at 504–07.

On February 27, 2012, Plaintiff saw Dr. Singh. Plaintiff continued to have anxiety and told the doctor she was angry at the emergency department regarding pain medication. Plaintiff reported right shoulder pain and also said she was sleeping better with the CPAP machine. Tr. at 534–35.

Plaintiff saw Dr. Singh on April 10, 2012. Tr. at 531–33. Plaintiff reported that she was having difficulty with her family, and she was living in a tent with her dog. Tr. at 532.

On April 11, 2012, Dr. Singh filled out a Medical Statement Concerning Bipolar Disorder and Related Conditions For Social Security Disability Claim. Tr. at 495–97. The doctor wrote that he had been treating Plaintiff since June 29, 2011. He said that Plaintiff's Axis I diagnoses were bipolar disorder and anxiety. The doctor said that Plaintiff's current GAF score was 50 [5]. The doctor was asked to indicate if Plaintiff had various symptoms of her disease. He said Plaintiff has symptoms such as anhedonia; appetite disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentration or thinking; thoughts of suicide, hallucination, delusions or paranoid thinking. He indicated that Plaintiff suffers from panic attacks which results in an inability to function outside her home. He said that she suffers from obsessive-compulsive symptoms and that she has recurrent and intrusive recollections of traumatic experience. Tr. at 495. As a result of those symptoms the doctor opined that Plaintiff had marked restrictions of activities of daily living and ability to maintain social functioning. Tr. at 495–96. Dr. Singh said that Plaintiff has deficiencies of con-

---

**5.** A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)

centration, persistence or pace resulting in failure to· complete tasks in a timely manner, and that she has repeated episodes of deterioration or decompensation in work or work-like settings which cause her to withdraw or experience exacerbation of signs and symptoms. The doctor was asked to rate Plaintiff's limitations in several domains. "Not Significant" was defined to mean absent or minimal limitations. The only domain rated not significant was the ability to carry out very short and simple instructions. Tr. at 496. "Moderate" was defined as more than slight but less than marked. The word slight was not defined. Listed as moderate were the ability to: remember locations and work-like procedures; the ability to understand and remember short and simple instructions; the ability to make simple work-related decisions; and, the ability to ask simple questions or request assistance. The term "Marked" was defined as serious limitations in this area—the ability to function is severely limited but not precluded. Domains listed marked were: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with and proximity with others without being distracted by them; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to travel in unfamiliar places or

use public transportation, and the ability to set realistic goals or make plans independently of others. The term "Extreme" was defined as no useful ability to function in this area. None of the domains were marked extreme. Tr. at 496–97. The doctor stated that Plaintiff's use of alcohol or other substances had no effect in his assessment. He said that as a result of her condition, Plaintiff would be unreliable. Tr. at 497.

Plaintiff saw Dr. Kaup on May 23, 2012, for continued pain in her ankle and shoulder. Tr. at 498–503. The doctor wrote that while he thought Plaintiff's shoulder pain was from a strain or other tendonopathy, if the pain did not improve significantly over the next week, he would refer Plaintiff for an orthopaedic consultation and/or an MRI. Tr. at 501.

## ADMINISTRATIVE HEARING

At the administrative hearing, Plaintiff testified that in the previous 15 years, she had 13 different jobs, half of which ended when she was fired due to her mental health problems. Tr. at 39.

After Plaintiff testified, the ALJ called Marian Jacobs to testify as a vocational expert. Tr. at 53. The ALJ asked the following hypothetical question:

> Could you please assume a hypothetical individual who has a 12th grade education who is under 50 years of age, so a younger individual and has performed jobs in the past that are consistent with the jobs that you've identified on your past work summary form ... and this hypothetical individual is limited to lifting and carrying up to 50 pounds occasionally but more frequently lifting and carrying up to 25 pounds, standing and walking would be limited to about six hours a day, sitting, six hours a day. This individual should have only occasional exposure to extreme cold, only

occasional exposure to extreme pulmonary irritants. This individual should never climb ropes, ladders or scaffolds. This individual would be precluded from performing highly detailed, highly complex job tasks. This individual would be precluded from working or interacting with the general public. This individual should have only occasional interaction with co-workers and supervisors, occasional interaction that would be short-lived, brief, superficial interaction. Now, with these limitations, could you tell me could this first hypothetical individual perform any work that's been performed the last 15 years.

Tr. at 56–57. The vocational expert testified that Plaintiff's past relevant work would be precluded, and that the hypothetical did not allow for any of Plaintiff's skills to transfer to other work. Tr. at 57. The ALJ asked the vocational expert to consider the hypothetical again but with the addition that the individual would be limited to jobs which could be learned in 30 days or less. Tr. at 58. The vocational expert cited unskilled jobs examples of which included laundry folder, industrial cleaner, and final assembler of optical frames. Tr. at 58–59. The vocational expert testified that if Plaintiff were unable to complete 8 hour work days, or 40 hour work weeks, then competitive work is not possible. Tr. at 59.

### ALJ's DECISION

In her decision, the ALJ explained how she arrived at the residual functional capacity finding. The ALJ accorded some weight to the opinion of Dr. Christiansen: "However, the undersigned does not find the claimant would be so distracted that she could not perform at a regular pace or perform simple tasks."

The ALJ wrote that she accorded minimal weight to the opinion of Dr. Singh. "Dr. Singh's opinion seems extreme in light of the medical evidence and the undersigned questions how the abuse of marijuana would 'not impact' the claimant's daily functioning."

The ALJ wrote that she accorded significant weight to the findings of the State Agency, "as they are consistent with the medical evidence when considered as a whole."

### DISCUSSION

■ We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007)). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005).

*Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully ana-

lyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

In her brief, Plaintiff argues that the ALJ failed to apply the treating physician standard to the opinions of the treating psychiatrist; the ALJ failed to properly evaluate the opinions of the treating psychiatrist; the ALJ failed to properly evaluate the opinion of the consultative psychologist; and the ALJ failed to properly evaluate Plaintiff's subjective allegations under the *Polaski* standard. Defendant takes issue with Plaintiff's arguments, and urges the Court to Affirm the final decision of the Commissioner.

> In any Social Security Disability case: Probably the most important issue will be the question of [residual functional capacity].... The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.

*McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en banc). In *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000), the Court wrote:

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *See Ghant v. Bowen,* 930 F.2d 633, 639 (8th Cir. 1991). A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir.1998). By contrast, "[t]he opinion of a consulting physician who examines a claimant

once, or not at all does not generally constitute substantial evidence." *Id.* Likewise, the testimony of a vocational expert, who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *See Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000).

■ The ALJ wrote that she gave little weight to the opinion of Singh because it seemed to the ALJ that the doctor's opinion was extreme in light of other evidence in the record. The very first treatment note in this record shows that Plaintiff was treated for injuries sustained in a bar fight during which she had a beer bottle broke over her head and was bitten. Plaintiff is a woman who gets into fights with 12 year old children. Plaintiff has been barred from visiting the primary care clinic at a county hospital. Plaintiff has been visited by officers of Homeland Security because of threats she made to federal government workers. Plaintiff told Dr. Christiansen that she was once jailed for terrorism. Plaintiff is a woman who becomes so agitated that she becomes catatonic because of, what for most people would be, minor stressors (Dr. Christiansen's terminology is "subjectively pressing issues"). A treating physician, Dr. Kaup as well as other physicians, opined that the catatonic spells were likely caused by psychiatric illness. The medical records reflect that the spells are always preceded by situations which cause Plaintiff anxiety. Dr. Kim wrote that Plaintiff seemed "extremely irritable, tense, and ready to explode, literally explode." Dr. Kim wrote that during his examination Plaintiff became extremely frustrated, and also that she had an extremely low anxiety tolerance. The Court agrees that the limitations noted by Dr. Singh seem extreme, but only because of the extreme nature of the illness upon which Dr. Singh is an expert. *See, Wilder v. Chater,* 64 F.3d 335, 337 (7th Cir.1995),

in which Judge Posner wrote that the experts in cases involving mental health disorders are psychiatrists, not judges or lawyers. In the case at bar, the experts are Dr. Singh and Dr. Christiansen.

■ The Court agrees with Plaintiff that the ALJ failed to apply a proper legal standard for the evaluation of Dr. Singh's and Dr. Christiansen's opinions. It is well settled law in the Eighth Circuit that the ALJ may not substitute his or her opinion for that of the physicians. *See, Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990)(... the ALJ ignored the law of this circuit, which states that the ALJ must not substitute his opinions for those of the physician. *See Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir.1989)). The Court finds no inconsistency between the opinions expressed by the psychiatrist and the psychologist. They are not identical because Dr. Singh had the benefit of seeing Plaintiff over a long period of time as the treating physician. Nevertheless, Dr. Christiansen was able to see from her one time evaluation that Plaintiff's mood disorder, her anxiety, stress, substance use, and personality disorder all contribute to Plaintiff's inability to maintain attention and concentration, her inability to maintain an even pace, and her inability to maintain relations which are "often marked by negative emotional exchanges, frequently with verbal hostility and occasionally with threats of physical violence."

In *Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir.1989), Judge Richard S. Arnold found error where the ALJ chose "to form his conclusions about the severity of Mrs. Easter's problems, disregarding [a treating physician's] opinion..." "What counts" in a finding of residual functional capacity, wrote Judge Arnold, "is the ability to perform as required on a daily basis in the 'sometimes competitive and stressful' environment of the working world." *Id.* citing *Douglas v. Bowen*, 836 F.2d 392, 396 (8th

Cir.1987)(quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982)(en banc)). Judge Arnold went on to cite the Court's statement in *Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir.1980) that "employers are concerned with substantial capacity, psychological stability, and steady attendance...."

■ The ALJ wrote that she relied on the opinions of the doctors at the state agency as evidence to support her finding that Plaintiff has the residual functional capacity to engage in substantial gainful activity. It is well settled law that the opinions of physicians who have not examined the claimant, do not constitute substantial evidence on the record as a whole upon which to base a denial of benefits. As Judge Beam, writing for the Court in *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000) points out, the opinion of a physician who does not examine a claimant, but only reviews the medical records, does not constitute substantial evidence upon which to base a denial of benefits. *See also, Brock v. Secretary of Health and Human Services*, 791 F.2d 112, 114 (8th Cir.1986) (The statements of physicians who never personally examined the claimant but only reviewed the reports of examining physicians, however do not constitute substantial evidence on the record as a whole. *See, e.g. Van Horn v. Heckler*, 717 F.2d 1196, 1198 (8th Cir.1983)).

The final decision of the Commissioner is not supported by substantial evidence on the record as a whole. On the contrary, Plaintiff has proved her case with medical evidence and is entitled to the benefits for which she applied.

The ALJ pointed out that Dr. Singh opined that the use of alcohol and/or marijuana would have no impact on Plaintiff. The ALJ wrote: "[T]he undersigned questions how the abuse of marijuana would "not impact" the claimant's daily function-

ing." Again, the ALJ offering her opinion of Plaintiff's medical condition. Dr. Singh was asked: "What impact, if any, does the use of alcohol or other substances have in arriving at your assessment?" to which he responded: "none". While there is evidence in the record that Plaintiff sometimes uses marijuana, there is no evidence which would indicate that such usage is frequent enough to have any impact on Plaintiff's ability to function. Dr. Christiansen said that Plaintiff uses marijuana occasionally. There is no evidence in this record to support a finding that alcoholism or drug abuse is, in any way, material to the finding of disability. *See, Brueggemann v. Barnhart,* 348 F.3d 689 (8th Cir. 2003).

## CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing text noted in *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987), and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole and is based on legal error. This case is reversed and remanded for an award of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[6]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa, 2005).

IT IS SO ORDERED.

---

**6.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."