# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1172

_____

Steven T. Owen,

        Appellant,

v.

Michael J. Astrue, Commissioner
of Social Security

        Appellee.

\*
\*
\*
\*
\*  Appeal from the United States
\*  District court for the
\*  Southern District of Iowa.
\*
\*
\*
\*

_____

Submitted: September 24, 2008
Filed: December 29, 2008

_____

Before WOLLMAN, SMITH, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

Steven Owen appeals the district court's[1] affirmance of the administrative law judge's (ALJ) denial of Owen's applications for disability insurance benefits (DIB) and supplemental security income (SSI) for the period of July 25, 1999, to February 14, 2002. Owen contends that the ALJ incorrectly weighed the medical opinions of his treating and consultative physicians. He also argues that the ALJ erred in omitting

_____

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

drowsiness from the ALJ's residual functional capacity (RFC) finding. We affirm the judgment of the district court.

## I. *Background*

Owen has sought treatment for lower back pain since at least 1986. Between October 1998 and February 2002, Owen regularly visited Dr. Steven Paulsrud, who prescribed painkillers and muscle relaxants and administered steroid injections for Owen's condition. An MRI of Owen's lower back performed in November 1998 revealed "[m]ild discogenic changes at the L2-3 level with no focal disc herniation." In December 1998, Dr. Paulsrud noted that although the MRI revealed no significant pathology, Owen was experiencing back pain with radiation into his right leg.

Owen attended an initial physical therapy evaluation in January 1999, but he failed to attend his subsequent physical therapy appointments. In March 1999, Dr. Paulsrud observed that Owen was suffering from "mild" lower back pain but was "doing very well" and had good strength and range of motion. Dr. Paulsrud also encouraged Owen to quit smoking and modify his diet, but Dr. Paulsrud noted the following month that Owen would not follow regular exercise or dietary plans. In July 1999, less than three weeks prior to the alleged disability onset date, Dr. Paulsrud observed that Owen's back pain was intermittent. Shortly after the alleged disability onset date, Dr. Paulsrud noted that Owen had increased his activity and, despite his continuing lower back pain, was "doing better."

Owen visited Dr. Rhea Allen, who had treated him for a hand injury in July 1998, for a consultative examination in March 2000. Dr. Allen noted that Owen suffered from lower back pain but handled his daily living activities independently. Based on a physical examination and a review of various treatment notes and the November 1998 MRI, Dr. Allen concluded that Owen could (1) lift ten pounds frequently and 20 pounds occasionally; (2) carry 15 pounds occasionally; (3) stand for an entire workday, given normal breaks; (4) walk for up to four hours each workday;

(5) sit in a chair with a backrest without limitation, given normal breaks; and (6) stoop, climb, kneel, and crawl occasionally. Although Dr. Allen recommended that Owen avoid work requiring highly repetitive, forceful gripping and grasping, she stated that he could perform light manufacturing work.

In May 2000, Dr. J.D. Wilson, a medical consultant for the Iowa Disability Determination Services Bureau, completed an RFC assessment form for Owen. Dr. Wilson reached similar conclusions regarding Owen's physical limitations as had Dr. Allen and explained that he had given "great weight" to Dr. Allen's opinions and recommendation.

When Owen returned to Dr. Paulsrud in May 2000, Dr. Paulsrud encouraged Owen "to try to get back to work." Dr. Paulsrud completed an RFC assessment form in which he indicated that Owen's condition would likely cause him to be absent from work about four days a month. Dr. Paulsrud referred Owen to physical therapy. Owen attended the initial physical therapy evaluation but then cancelled six consecutive physical therapy appointments.

Dr. Robert Knox completed an RFC assessment form in June 2000, finding Owen's alleged limitations to be inconsistent with his activities of daily living. Dr. Knox indicated that Owen could (1) lift 25 pounds frequently and 50 pounds occasionally; (2) stand and walk for about six hours each workday, given normal breaks; (3) sit for about six hours each workday, given normal breaks; and (4) push and pull without limitation.

Dr. Paulsrud completed an RFC assessment form in August 2000, concluding that Owen (1) could lift ten pounds occasionally; (2) could sit or stand for 60 minutes before changing position; (3) could stoop, crouch, and climb stairs occasionally; (4) had limited ability to reach overhead, push, and pull; (5) should never climb ladders; (6) should avoid working with machinery, at extreme temperatures, and at heights;

and (7) would likely be absent from work more than three times a month because of his condition.

In January 2001, Dr. Paulsrud completed an RFC assessment form in which he indicated that Owen (1) could lift ten pounds frequently and occasionally; (2) could stand and walk for about four hours each workday, given normal breaks; (3) could sit for about four hours each workday, given normal breaks; (4) could climb stairs occasionally; (5) could never twist or climb ladders; (6) could sit or stand for 30 minutes before changing position; and (7) must walk around for five minutes every half hour.

An MRI of Owen's lower back performed in October 2001 revealed "[m]ild L2-3 degenerative disc disease without significant interval change" and "[m]inimal left posterolateral L4-5 disc protrusion." Dr. Paulsrud completed a fourth RFC assessment form that month, finding that Owen experienced sedation and drowsiness for one to two hours as side effects of his medication and that Owen could work no more than four hours a day "to start." In November 2001, Owen received an epidural steroid injection and was instructed to limit his activity for two to three days and to avoid heavy lifting.

On February 7, 2002, one week before the end of Owen's alleged disability period, Owen informed Dr. Paulsrud that he had recently fallen on ice and was experiencing neck and leg pain. On February 17, 2002, three days after the end of the alleged disability period, Owen visited the emergency room with severe back pain. At the end of February 2002, Dr. Paulsrud noted that Owen was unable to stay in one position for more than 45 minutes.

In a letter to Owen's attorney dated March 13, 2002, Dr. Paulsrud stated that Owen's two MRIs revealed "degenerative disk disease caus[ing] a bone-to-bone contact in [Owen's] lumbar spine." Dr. Paulsrud also explained that Owen would

initially need to limit any work to four hours a day and that it is difficult for individuals with Owen's condition to find employment unless they are retrained for clerical work. In June 2002, Dr. Wilson completed another RFC assessment form and stated that the "liberal recommendations" contained in Dr. Paulsrud's March 13 letter were not supported by Owen's medical record and that Owen's complaints were not supported by the October 2001 MRI.

At Owen's hearing before the ALJ on October 29, 2001, a vocational expert responded to a number of hypothetical questions based primarily on Dr. Allen's and Dr. Paulsrud's assessments of Owen's physical limitations. First, the vocational expert testified that the limitations set forth by Dr. Allen following her March 2000 consultative examination would preclude performance of Owen's previous duties as a construction worker and foundry worker but would allow him to perform the duties of a parking attendant, rental clerk, and cashier II (clerical). Second, the vocational expert testified that Owen could perform the duties of a parking attendant, arcade attendant, and survey worker if Owen (1) could lift ten pounds frequently and occasionally; (2) could stand and walk for up to four hours each day; (3) could sit for up to four hours each day with changing of position every 60 minutes; (4) could not twist or use ladders; (5) could stoop, crouch, work overhead, push, and pull infrequently; (6) could climb steps occasionally; (7) could not be exposed to extreme temperatures; and (8) could not work around machinery or at heights. These limitations were derived from Dr. Paulsrud's August 2000 and January 2001 RFC assessment forms.

The vocational expert also testified, however, that if the second hypothetical were amended so that Owen had to change position every 30 minutes and walk around for five minutes after 30 minutes of sitting—limitations expressed in Dr. Paulsrud's January 2001 RFC assessment form—then he would be unable to perform any unskilled jobs. Furthermore, based on limitations set forth in Dr. Paulsrud's May 2000, August 2000, and October 2001 RFC assessment forms, the vocational expert testified

that Owen would be unable to perform any job if he had to miss more than three days of work each month or could work only four hours each day. Finally, the vocational expert testified that Owen would be unable to perform any job if he were unable to stay awake, a limitation apparently based on Owen's testimony at the hearing that his medication "puts [him] to sleep" and on Dr. Paulsrud's statement in his October 2001 RFC assessment form that Owen experienced sedation and drowsiness as side effects of his medication.

In his December 23, 2004, decision concluding that Owen was not disabled from July 25, 1999, to February 14, 2002, the ALJ followed the five-step disability analysis of 20 C.F.R. §§ 404.1520, 416.920. At steps one through four, the ALJ found that (1) Owen was not engaged in substantial gainful activity, (2) his impairments were severe, (3) his impairments did not meet or equal a listed impairment, and (4) he lacked the RFC to perform his previous duties as a construction worker and foundry worker. But at the final step of the disability analysis, the ALJ determined that Owen was not disabled because he possessed the RFC to perform other jobs that exist in significant numbers in the national economy, specifically parking lot attendant, rental clerk, and cashier II.

The ALJ adopted Dr. Allen's assessment in determining Owen's RFC and concluded that Owen's medical record did not reflect "much in the way of an objective problem." Characterizing Dr. Allen as a "treating physician," the ALJ stated that her findings were "consistent with the evidence in the record as a whole." The ALJ concluded that Dr. Paulsrud's medical opinions expressed in his RFC assessment forms were not entitled to controlling weight because they were inconsistent with Owen's medical record, were based on Owen's allegations, and failed to account for Owen's lack of compliance with treatment and medication instructions. Finally, although the ALJ made a formal finding that Owen's allegations were supported by the record and were credible, the ALJ explained in the body of his decision that Owen's allegations were "less than fully credible."

The district court affirmed the ALJ's denial of Owen's applications for DIB and SSI, concluding that substantial evidence on the record as a whole supported the ALJ's determination that Owen was not disabled. The court acknowledged that a treating physician's opinion is generally entitled to more weight than is the opinion of a consultative physician. But the court stated that it was unnecessary to address whether Dr. Allen qualified as a treating physician because the ALJ articulated legitimate reasons for discounting Dr. Paulsrud's medical opinions.

## II. *Discussion*

We review de novo the district court's decision to uphold the ALJ's denial of Social Security benefits. *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir. 2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

A. *Medical Opinions of Dr. Allen and Dr. Paulsrud*

Owen first argues that the ALJ erred in giving more weight to the medical opinions of Dr. Allen than to the medical opinions of Dr. Paulsrud. Specifically, Owen contends that the ALJ erred in declining to give Dr. Paulsrud's medical opinions controlling weight and in deeming Dr. Allen a treating physician.

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record." *Wagner*, 499 F.3d at 848 (quoting 20 C.F.R. § 404.1527(b)); *see also* 20 C.F.R. § 416.927(b). The Social Security regulations provide that a treating source's opinion regarding "the nature and severity" of a claimant's condition is entitled to "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (stating that "we have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions" (internal citation and quotation marks omitted)).

Typically, medical opinions from treating sources are entitled to greater weight than are medical opinions from consultative sources:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). "Treating source" is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." *Id.* §§ 404.1502, 416.902.

The parties agree that Dr. Paulsrud qualifies as a treating physician under the Social Security regulations. But substantial evidence on the record as a whole supports the ALJ's conclusion that Dr. Paulsrud's medical opinions expressed in his RFC assessment forms were not entitled to controlling weight. First, those opinions are inconsistent with Owen's medical record. *See id.* §§ 404.1527(d)(2), 416.927(d)(2) (stating that a treating source's medical opinion is entitled to "controlling weight" if the opinion "is not inconsistent with the other substantial evidence in [the] case record"). The October 2001 MRI, for example, revealed only "mild" degenerative disk disease and "minimal" disk protrusion. Additionally, Dr. Paulsrud's opinions were contradicted by the opinions of Dr. Allen, Dr. Wilson, and Dr. Knox; in fact, Dr. Wilson specifically criticized the "liberal recommendations" contained in Dr. Paulsrud's March 13, 2002, letter as being inconsistent with Owen's medical record. Finally, Owen's activities of daily living do not reflect the physical limitations found by Dr. Paulsrud.[2]

Second, the ALJ was also permitted to discount Dr. Paulsrud's medical opinions expressed in his RFC assessment forms due to their inconsistencies. *See Prosch*, 201 F.3d at 1013 (stating that "we have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician . . . where a treating physician renders inconsistent opinions that undermine the credibility of such opinions"). Dr. Paulsrud's RFC assessment forms contain the following inconsistencies: (1) that Owen could stand and walk for about four hours each workday and that he could do so for less

---

[2]Owen claims that a cervical spine x-ray performed on April 22, 1996, revealed that he suffered from "extremely severe degenerative changes," but the medical record on which he relies is for another patient.

than two hours each workday; (2) that Owen could sit for about four hours each workday and that he could do so for less than two hours each workday; (3) that Owen could sit for two hours before needing to get up and that he could sit for only 30 minutes before needing to change position; (4) that Owen should avoid working with machinery, at extreme temperatures, and at heights and that he had no such restrictions; and (5) that Owen's ability to reach and handle was affected by his impairment and that his ability to reach and handle was not affected by his impairment. Furthermore, Dr. Paulsrud's conclusions in his RFC assessment forms appear inconsistent with his characterization of Owen's back pain as "mild" and his statement that Owen should "try to get back to work."

In *Juszczyk v. Astrue*, we held that substantial evidence supported the ALJ's decision not to rely on a treating physician's assessment of the claimant's mental limitations. 542 F.3d 626, 632–33 (8th Cir. 2008). The ALJ had rejected the treating physician's assessment because it was inconsistent with the treating physician's own treatment notes, objective testing, and other medical evidence in the record. *Id.* at 632. Our review of the record confirmed the ALJ's conclusion. *Id.* Similarly, Dr. Paulsrud's medical opinions expressed in his RFC assessment forms are inconsistent with one another, his treatment notes, the MRIs, and the medical opinions of the other physicians.

In his decision, the ALJ indicated that one of the reasons he did not give Dr. Paulsrud's medical opinions controlling weight was that Dr. Paulsrud did not account for Owen's noncompliance with treatment and medication instructions in assessing the degree of Owen's impairment. Owen argues that noncompliance "is an illegal factor to consider" because the Social Security regulations provide that a treating source's medical opinion is entitled to controlling weight so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). But a claimant's noncompliance can constitute

evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight. *Cf. Brown v. Barnhart*, 390 F.3d 535, 540–41 (8th Cir. 2004) (holding that the ALJ was free not to give controlling weight to a treating physician's opinion that the claimant was disabled because substantial evidence indicated that the claimant was noncompliant with her prescribed treatment without good reason and, therefore, was not disabled). In light of Owen's failure to attend his physical therapy appointments, stop smoking, and follow regular exercise and dietary plans, the ALJ did not err in considering Dr. Paulsrud's failure to account for Owen's noncompliance.[3]

Having determined that the ALJ did not err in declining to give Dr. Paulsrud's medical opinions controlling weight, we next consider whether the ALJ erred in subordinating Dr. Paulsrud's medical opinions to the medical opinions of Dr. Allen. Owen argues that the ALJ erred in deeming Dr. Allen a treating physician, but we agree with the district court that it is unnecessary to address that issue. Even if Dr. Allen is deemed to be a non-treating physician, the ALJ was entitled to give more weight to her medical opinions than to the medical opinions of Dr. Paulsrud. *See, e.g.*, *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (concluding that any error on the part of the ALJ was harmless because there was "no indication that the ALJ would have decided differently" in the absence of the error).

---

[3]Owen also claims that the ALJ violated Social Security Ruling (SSR) 82-59, 1982 WL 31384, in considering Dr. Paulsrud's failure to account for Owen's noncompliance. But SSR 82-59 "explains the circumstances in which the Secretary may deny benefits to an otherwise disabled individual on the basis that the claimant has failed to follow . . . prescribed treatment" and "only applies to claimants who would otherwise be disabled within the meaning of the Act." *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001). SSR 82-59 does not apply to this case, in which the ALJ considered Owen's noncompliance for purposes of determining the weight to give Dr. Paulsrud's medical opinions.

Under the Social Security regulations, the amount of weight given to a non-controlling medical opinion is determined by applying the following factors: (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion." 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Wagner*, 499 F.3d at 848.

Because Dr. Allen and Dr. Paulsrud both examined Owen, the first factor is neutral. The second factor favors granting Dr. Paulsrud's medical opinions more weight because he treated Owen for a longer period of time and more frequently than did Dr. Allen. But because Owen's medical record and his activities of daily living support Dr. Allen's opinions and undermine Dr. Paulsrud's opinions, the third and fourth factors strongly favor granting Dr. Allen's opinions more weight. Finally, because the record does not reflect whether Dr. Paulsrud or Dr. Allen are specialists and because we are aware of no other factors that should be considered, the fifth and sixth factors—like the first factor—are neutral. The application of the six-factor test supports the ALJ's decision to give more weight to the medical opinions of Dr. Allen than to the medical opinions of Dr. Paulsrud.

The ALJ's determination that the medical opinions of Dr. Allen were entitled to more weight than were the medical opinions of Dr. Paulsrud is supported by our decision in *Travis v. Astrue*, 477 F.3d 1037. The claimant in *Travis* argued that the ALJ did not give the opinions of her treating physicians appropriate weight in concluding that she was not disabled. *Id.* at 1040–41. In particular, the claimant "argue[d] that a one-time medical evaluation does not provide substantial evidence for the ALJ's decision." *Id.* at 1042. We held that substantial evidence supported the ALJ's decision, emphasizing that "the ALJ's determination to grant [the claimant's] treating

physicians' opinions less weight is supported by more than a one-time medical evaluation and is supported by medical evidence." *Id.* We stated that we would "not reverse merely because evidence also points to an alternate outcome." *Id.* Similarly, the ALJ's decision in this case is supported by Dr. Allen's opinion, the opinions of other physicians, and the medical evidence in the record.

B. *Absence of Drowsiness in the ALJ's RFC Finding*

Owen next argues that the ALJ erred in omitting drowsiness from the ALJ's RFC finding, emphasizing that the vocational expert testified that Owen would be unable to perform any job if he were unable to stay awake. Owen contends that the inconsistency between the ALJ's formal finding that Owen was credible and the ALJ's explanation in the body of his decision that Owen was not credible is relevant to our review of the ALJ's decision not to include drowsiness in his RFC finding.

"We have held that an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (internal quotation marks omitted). The ALJ did not omit drowsiness from his RFC finding based on Owen's credibility; rather, the ALJ reasoned as follows:

> [Owen] thought the medication Hydrocodone had caused sleepiness and fatigue. However, the medical records do not establish the existence of any side effect from any medication which had lasted for a 12 month continuous period, given attempts at adjustment or substitution and which would further credibly reduce Mr. Owen's work capacity beyond that outlined in the residual functional capacity found for him . . . .

Additionally, the ALJ stated that "[t]hough the claimant has reported some side effects, adjustment or substitution of medication [has] permitted the claimant to tolerate such effects, given the balance between the limited severity of side effects versus the significant benefits provided by the medication." The inconsistency in the

-13-

ALJ's decision regarding Owen's credibility had no effect on the ALJ's decision not to include drowsiness in his RFC finding.

Furthermore, we have held that an ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when "[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities." *Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994). Likewise, we have held that an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that his impairments "significantly restricted his ability to perform gainful employment." *Eurom v. Chater*, 56 F.3d 68 (8th Cir. 1995) (per curiam) (unpublished table decision). There is no evidence in the record that the drowsiness experienced by Owen as a result of his medication was uncontrollable or restricted his ability to work. Accordingly, the ALJ did not err in omitting drowsiness from his RFC finding.

## III. *Conclusion*

Because substantial evidence on the record as a whole supports the ALJ's determination that Owen was not disabled from July 25, 1999, to February 14, 2002, we affirm the judgment of the district court.

_____