**Robert Molloy WAKEFIELD, Jr. Plaintiff,**

v.

**Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.**

**4:15–cv–218 RP–SBJ**

United States District Court, S.D. Iowa, Central Division.

Signed March 16, 2016

---

Timothy N. Tripp, Tripp, P.C., Pella, IA, for Plaintiff.

William C. Purdy, U.S. Attorney's Office, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Judge, United States District Court

Plaintiff, Robert Molloy Wakefield, Jr., filed a Complaint in this Court on July 15, 2015, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

On April 26, 2012, Plaintiff filed an application for benefits. Tr. at 179–87. Plaintiff, whose date of birth is March 7, 1959 (Tr. at 181), was nearly 55 years old at the time of the hearing on February 26, 2014, before Administrative Law Judge David G. Buell (ALJ). Tr. at 33–92. The ALJ issued a Notice Of Decision—Unfavorable on April 24, 2014. Tr. at 11–27. The Appeals Council declined to review the ALJ's decision on May 28, 2015. Tr. at 1–3. Thereafter, Plaintiff commenced this action.

At the first step of the sequential evaluation (20 C.F.R. § 404.1520(a)(4)), the ALJ found that Plaintiff has not engaged in substantial gainful activity after October 10, 2009, the alleged disability onset date. At the second step, the ALJ found Plaintiff has the following severe impairments: degenerative joint disease of the left shoulder; sleep apnea; diabetes; obsessive-

compulsive disorder; mood disorder and anxiety disorder. The ALJ found that Plaintiff's impairments were not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 16. At the fourth step, that ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he may crawl, climb, or reach overhead with his left, upper extremity only occasionally. Moreover, the claimant requires a work environment he would not be exposed to hazards, such as unprotected heights, and he cannot operate machinery or motor vehicles. He is further requires (sic) simple, routine, repetitive work, requiring no close attention to detail or use of independent judgment. Finally, all tasks assigned to the claimant would have to be done without interaction with the public.

Tr. at 18. The ALJ found that Plaintiff is unable to perform any of his past relevant work. At the fifth step of the sequential evaluation, the ALJ found that there are a significant number of jobs which Plaintiff can perform in his impaired condition. Tr. at 25. Examples of such work are gas and oil servicer, laundry laborer, and general helper. Tr. at 26. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 27.

## MEDICAL EVIDENCE

On February 23, 2009, Plaintiff was seen at Mercy Medical Center in Centerville, Iowa after he fell and injured his left arm. Tr. at 349–51. Plaintiff injured his left shoulder in a work related accident, and was treated by Donald D. Berg, M.D. of Orthopedic and Reconstructive Surgery in Ottumwa, Iowa. An MRI showed a "nondisplaced fracture of the greater tuberosity the proximal left humerus." Tr. at 321. When Dr. Berg was informed of the re-

sults of the MRI, he restricted Plaintiff to "light work duty, no lifting with his left arm and probably use a sling for another week or two if it is bothering him a lot." The doctor opined that with the passage of time, the fracture would heal satisfactorily. Tr. at 320. On April 7, 2009, Dr. Berg recommended out patient physical therapy and swimming, to loosen the shoulder. On April 21, 2009, Plaintiff was still having a lot of pain and limited motion. Dr. Berg opined that Plaintiff had developed a frozen left shoulder. The doctor gave Plaintiff an injection of Xylocaine and cortisone and recommended that Plaintiff not do work involving repetitive use of his hands. Tr. at 319. On June 1, 2009, Dr. Berg released Plaintiff for light duty with no lifting above his left shoulder. Tr. at 318. On July 17, 2009, Plaintiff told Dr. Berg that he was having pain in his lower back which the doctor said "is partially associated with his shoulder because of the limitation of motion and the frozen shoulder on the left." Tr. at 318. Plaintiff was to continue doing light work but with no lifting more than 10 pounds above his left shoulder. Tr. at 317. On October 28, 2009, Plaintiff told Dr. Berg that he had quit working. The doctor noted that Plaintiff was limited to lifting 10 pounds. Plaintiff complained of anxiety and he was referred to a psychiatrist. Dr. Berg gave Plaintiff an impairment rating of 23% of the left upper extremity. The doctor wrote that the impairment rating would drop to near zero if Plaintiff had arthroscopy with range of motion followed by physical therapy. Plaintiff, however, was not interested in the surgery. Tr. at 316.

Plaintiff received primary care at Centerville Family Care Clinic. Tr. at 310–14. On January 26, 2010, Plaintiff complained of increasing depression after he had been laid off from his job. The diagnosis was acute situational depression, and Plaintiff was given a prescription for Citalopram. Tr. at 311. On March 9, 2010, Plaintiff

reported that he was not sleeping well. It was noted that he had been on Lorazepam for anxiety, and that he was taking citalopram as an antidepressant. It was noted that the medications were not having the desired effect. Seroquel was added to Plaintiff's medications to help him sleep. Tr. at 310.

On July 2, 2010, Plaintiff was seen at Mercy Medical Center—Centerville, for a rash on his arms and chest. Tr. at 340–48.

On August 2, 2010, Plaintiff saw L.G. Heikes, M.D. Plaintiff complained of depression, but also reported complaints of diabetes, back pain, left shoulder pain and complaints of obsessive compulsive disorder (OCD). Plaintiff complained of feeling down, crying spells, no energy, no interest, poor memory and concentration, poor eating and sleeping patterns and thoughts of suicide. Plaintiff reported that he will take a shower 6 or 7 times per day. Plaintiff also complained of pain on the right side of his neck that radiates to the upper arm. Tr. at 377. After an examination, the doctor diagnosed depression, type 2 diabetes, cervical strain, and left abdominal pain with some history of GERD. The doctor recommended treatment for depression, anxiety, and OCD. The doctor prescribed citalopram. Tr. at 378.

On August 12, 2010, Plaintiff was seen for an intake evaluation by therapist Mark Trullinger, MS. Tr. at 322–27. Plaintiff reported depression, trouble breathing, and feeling as though things are not real. Tr. at 322. Plaintiff's medical conditions were listed as diabetes, sleep apnea, shoulder injury and chronic pain. His medications were Citolopram, glyperide, and metformin. Tr. at 323. On mental status exam, Plaintiff's mood was described as anxious, and the therapist wrote: "He has been having intense anxiety lately and it causes him to have an upset stomach and a lack of sleep." Tr. at 325. The therapist wrote:

> The [patient] reports a lot of severe depression symptoms. He also reports perceptual disturbances that have him questioning whether or not things around him are real. He reports only 2 manic symptoms and does not report that they cause him any difficulty in life or occur at the same time. He has also started to develop some personality behaviors that are obsessive-compulsive, such as excessive hand washing and showering. He is also developing a phobia for germs.

Tr. at 326. The therapist's diagnostic impression on Axis I [1], was major depressive disorder, recurrent, severe with psychotic features. On Axis II, the impression was rule out obsessive-compulsive personality disorder. On Axis V, the current global assessment of functioning [2] was rated at 40–45. Prognosis was rated as fair. Tr. at 327.

---

**1.** The Diagnostic and Statistical Manual of Mental Disorders, a publication of the American Psychiatric Association, sets forth a multiaxial assessment which mental health providers find useful when diagnosing and treating mental impairments. Axis I, classifies clinical disorders and other conditions that may be a focus of clinical attention. Axis II classifies personality disorders and mental retardation. Axis III classifies general medical conditions. Axis IV classifies psychosocial and environmental problems. And, Axis V is a Global Assessment of Functioning (GAF). *DSM—IVTR* at page 27.

**2.** The Global Assessment of Functioning scale rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." The GAF uses a scale of 0 (inadequate information) to 100 (superior functioning in a wide range of activities). A rating between 41 and 50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM–IV–TR at 34. See also, footnote 2 above.

On September 1, 2010, Plaintiff told Dr. Heikes that he felt better taking the citalopram, but was not completely over the depression, anxiety and OCD. The dosage of citalopram was increased. Tr. at 376.

On October 1, 2010, Plaintiff saw Dr. Heikes. Plaintiff reported that his depression seemed better, but that he still had symptoms of OCD. Plaintiff also asked the doctor to look at a rash he had contracted after weeding. Tr. at 375.

Plaintiff saw Dr. Heikes on November 1, 2010. Regarding depression the doctor noted that Plaintiff was feeling better and that there was a possibility that he could begin working. The doctor renewed Plaintiff's prescription for citalopram, and encouraged him to work if he was able to get a job. Tr. at 374.

On December 10, 2010, Plaintiff saw Dr. Heikes. Plaintiff complained of leg pain, left worse than right. Plaintiff requested a muscle relaxer but stated that he did not want narcotic medication. The doctor gave Plaintiff a prescription for Flexeril. Tr. at 373.

On January 14, 2011, Plaintiff's saw Dr. Heikes who ordered some blood tests and renewed Plaintiff's medications. Tr. at 372.

On February 1, 2011, Plaintiff was seen at Mercy Medical Center—Centerville for muscelskeletal pain after a fall. Tr. at 329–39.

On February 24, 2011, Plaintiff was given a prescription for BuSpar for his anxiety, by a nurse at Dr. Heikes' clinic. Tr. at 369–70.

On May 18, 2011, Plaintiff saw Dr. Heikes for medication refills. Plaintiff told the doctor he would like to get a job driving a truck. The doctor wrote a note stating that Plaintiff would not have a weight restriction on his shoulder. Tr. at 367. On June 13, 2011, Dr. Heikes wrote a letter stating that he had treated Plaintiff for diabetes which was under control with medication. The doctor wrote there was no contraindication to Plaintiff driving trucks. Tr. at 366.

On January 11, 2012, Plaintiff saw Patricia Blackledge, ARNP, a nurse in Dr. Heikes' clinic. Plaintiff complained of a rash which the nurse thought was a herpes zoster or shingles. Plaintiff was given a prescription for Neurontin. Plaintiff had stopped taking any medication and he was not checking his blood sugars. The nurse wrote:

He has a history of anxiety, OCD, depression and diabetes. He does not take any medications. He stopped taking his medications a while back because he said they were not working so he has not taken anything. He is not taking his Metformin, his Glipizide, his aspirin, his Citalopram, his Actos, his BuSpar and he is not taking anything. He does not check his blood sugars anymore and he does not monitor his health in any way. He has been off of them now for a couple of months. He did not take them regularly before. He is very anxious. He has many ritualistic behaviors that almost paralyze him some days with all the things he has to do before he can get going and get things done. He states that he is ready to die and go to heaven. He has decided he may not want to take care of his health problems. He is just tired of things that do not work, being anxious and having continued problems with his health. Although he denies homicidal or suicidal ideations. When I questioned him directly, he just states that he does not know if he has enough energy to fight all of his health problems with his overwhelming OCD and anxiety.

Tr. at 363–64.

On February 2, 2012, Plaintiff saw Nurse Blackledge. His rash had cleared,

and the nurse and Plaintiff discussed plans for getting him back on medication for diabetes and the mental health illnesses. Tr. at 361–62.

Plaintiff saw Nurse Blackledge again on February 17, 2012, for more instruction regarding his medication. Nurse Blackledge prescribed Byetta, an injectable medication used to treat type 2 diabetes. Tr. at 359–60.

On March 20, 2012, Plaintiff reported that he had only taken Byetta a couple times because he did not like injecting himself two times per day as he had been instructed. He was, however, willing to inject himself once a day, so Victoza was substituted for Byetta. Plaintiff had also not been compliant with the prescription for Pristiq, an antidepressant. Plaintiff agreed to take both medications as prescribed. Tr. at 357–58.

On May 16, 2012, Plaintiff saw Nurse Blackledge, and he reported that he had not been taking any of the medication prescribed for OCD. He was also not taking Victoza as prescribed. Plaintiff said he was not interested in seeking counseling, but he was willing to accept a referral to a Dr. Dasari. Tr. at 355–56.

On July 16, 2012, Plaintiff was seen by Richard A. Martin, Ph.D. for a psychological evaluation. Tr. at 389–93. Plaintiff's work history was noted to be that of a crane operator and truck driver. Plaintiff admitted to a history of alcohol and drug abuse with no usage for 2 1/2 years. Tr. at 389. Dr. Martin observed that although Plaintiff presented as somewhat anxious, he appeared rather "gamey" about his problems. Dr. Martin noted that while Plaintiff expressed a desire to receive help, there was evidence that he had a history of poor compliance with medication/therapy. Dr. Martin wrote: "Overall, his presentation was consistent with a diagnosis of a factitious disorder." Tr. at 390. On mental status examination, Plaintiff's level of consciousness was within normal limits. He showed good attention, concentration, and orientation. Plaintiff's language abilities were intact. Plaintiff's mood appeared somewhat anxious with occasional labile affect. Tr. at 391. Dr. Martin opined that Plaintiff possesses the cognitive capabilities to work within a wide range of simple unskilled and semi-skilled jobs. Tr. at 392. On Axis I, Dr. Martin diagnosed: 1) major depressive disorder, recurrent, mild; 2) generalized anxiety disorder; 3) polysubstance abuse by history; 4) RO factitious disorder with combined psychological and physical signs and symptoms; and 5) RO malingering. Tr. at 393.

On July 18, 2012, Plaintiff saw Nurse Blackledge. The chief complaint was noted to be: "He is here to talk about the medicines he is not taking for his anxiety, COPD and his diabetes." Nurse Blackledge wrote: "He gets online and researches the medications we prescribe, then becomes anxious and upset and does not take them." It was noted that Plaintiff was having neuropathy in his feet and around his right chest wall and that Neurontin relieved those symptoms. Plaintiff agreed to take insulin to treat his diabetes, and the nurse noted that Plaintiff had peripheral diabetic neuropathy, renal failure and other complications of diabetes, and that it was only a matter of time before he had a heart attack, renal failure, or diabetic retinopathy. Nurse Blackledge wrote that Plaintiff's condition remained "unchanged and continues to [be] complicated by anxiety, panic disorder, depression, OCD, ritualistic behaviors that interfere with life, uncontrolled diabetes mellitus type 2, postherpetic neuralgia in the chest wall and right axilla, increased and new diabetic neuropathy." It was noted that Plaintiff was taking Metformin, Glipizide, aspirin, and Neurontin. The dosage of Neurontin was increased, and Plaintiff was begun on insulin in the form of a Levemir pen. Tr. at 448.

On August 1, 2012, Plaintiff was seen by Donald Junge, D.O., at Broadlawns Medical Center in Des Moines, Iowa. Tr. at 426–28. Plaintiff complained of burning pain in his right upper quadrant. He reported the previous diagnosis of shingles. Plaintiff said that for two days, the pain had "descended into his RUQ" and was not being controlled by the gabapentin (Neurontin) prescribed by his primary care provider. Tr. at 426. Plaintiff was given a prescription for a lidoderm patch and advised to continue his other medications as prescribed. Tr. at 428.

On August 14, 2012, Plaintiff saw David Fraser, M.D. for consultative examination. Tr. at 394–98. Plaintiff estimated that his lifting and carrying capacity was limited to about 30 pounds. Tr. at 394. On physical examination, Plaintiff's left upper extremity was limited in abduction and he complained of pain on passive range of motion. The doctor noted that Plaintiff is left hand dominant. Tr. at 395.

On August 28, 2012, Plaintiff underwent several diagnostic tests at Mercy Medical Center–Centerville in an attempt to find the cause of abdominal pain. Tr. at 400–18. Later, Plaintiff saw Nurse Blackledge who noted that Plaintiff was complaining of increased burning pain in the chest area. The nurse wrote that all of the diagnostic tests were negative. Plaintiff reported that when the Neurotin wore off, the pain increased. Plaintiff was taking insulin as prescribed. It was noted that before Plaintiff could leave his house that day, he showered five times. Tr. at 453.

X-rays of Plaintiff's lumbar spine dated September 21, 2012, were unremarkable. Tr. at 420.

On October 17, 2012, Plaintiff saw Rebecca Bollin, D.O., at Broadlawns Medical Center for a second opinion regarding his chest wall pain, and for other health problems. Tr. at 422–25. Plaintiff reported that the Lidoderm patches which had been prescribed by Dr. Junge in August, didn't help. It was noted that Plaintiff was seeing a psychologist, and was scheduled to see a psychiatrist. Tr. at 422. Dr. Bollin agreed with the diagnosis of postherpetic neuralgia to explain Plaintiff's chest wall pain. The doctor added Capzacin–P to his medication list. Plaintiff was encouraged to keep his appointment with the psychiatrist. The doctor scheduled a sleep study to assess possible sleep apnea. Tr. at 424.

On October 23, 2012, Deb Anderson, of Community Health Centers of Southern Iowa, wrote that Plaintiff had sought treatment at the clinic for OCD behavior. Plaintiff had symptoms of anxiety, depression, hopeless, worthlessness and crying spells. Plaintiff was seen at the clinic twice, and had little improvement. Tr. at 353.

On October 29, 2012, Plaintiff saw Roshan Dasari, M.D., M.P.H. at Community Health Centers of Southern Iowa. Tr. at 429–33. Plaintiff reported that his OCD began after he was sexually abused as a child. Tr. at 429. After a review of Plaintiff's history and a mental status examination, the doctor wrote that Plaintiff appears to have "prototypical symptoms of OCD with significant, severe obsessions and undoing defenses of compulsions causing significant dysfunction to the point of five to six showers each day." Tr. at 431. On Axis I, Dr. Dasari diagnosed OCD, severe; depression NOS (related to OCD); and rule out posttraumatic stress disorder. On Axis II, the diagnosis was rule out cluster A [3]. Dr. Dasari outlined a six part

---

**3.** . Personality disorders are grouped into three clusters based on descriptive similarities. Cluster A includes Paranoid, Schizoid, and Schizotypal Personality disorders. Indi-viduals with these disorders often appear odd or eccentric. Cluster B includes Antisocial, Borderline, Histrionic, and Narcissistic per-

treatment plan which included a prescription of Zoloft, and encouragement to continue counseling with Deb Anderson. Tr. at 432–33. Plaintiff saw Dr. Dasari on a monthly basis beginning December 3, 2012. Tr. at 483–89.

On December 3, 2012, Plaintiff saw Nurse Blackledge for a follow-up examination. Tr. at 467–70. Plaintiff was seen again on January 7, 2013. Tr. at 473–77. It was noted that Plaintiff's blood sugars were improving. It was also noted that Plaintiff was feeling a little better taking the zoloft prescribed by Dr. Dasari. Nevertheless, Plaintiff still had symptoms of OCD. Tr. at 474.

On April 17, 2013, Plaintiff underwent a sleep study which showed obstructive sleep apnea syndrome. Tr. at 505. On June 10, 2013, Plaintiff saw Dr. Bollin who gave him a prescription for an autoPAP machine to treat the sleep apnea. Tr. at 501–04.

On August 25, 2013, Dr. Dasari completed a Mental Residual Functional Capacity Questionnaire form. Tr. at 496–99. The doctor wrote that Plaintiff was taking a very high dose of Zoloft, Risperdal, and klonopin. The doctor said medication side effects included fatigue, dizziness, and impaired concentration. Clinical findings included pathological doubt, intrusive negative cognitions, hopelessness, helplessness, and depressed mood. Prognosis was "guarded." Tr. at 496. On a check list, the doctor identified the following signs and symptoms: Anhedonia or pervasive loss of interest in almost all activities; decreased energy; thoughts of suicide; feelings of guilt or worthlessness; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; pathological dependence, passivity or agressivity; persistent disturbance of mood or affect; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions which are a source of marked distress; persistent irrational fear of a specific object activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation; intense and unstable interpersonal relationships and impulsive and damaging behaviors; perceptual or thinking disturbances; motor tension; emotional lability; deeply ingrained maladaptive patterns of behavior; pathologically inappropriante suspiciousness or hostility; easy distractibility. Tr. at 497. The doctor was asked to rate several activities on a scale of unlimited or very good, limited but satisfactory, seriously limited but not precluded, unable to meet competitive standards, and no useful ability to function. Under the column unable to meet competitive standards (defined as: "your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting), the following activities are identified: remember work like procedures; carry out very short and simple instructions; maintain attention for two hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; get along with co-

sonality disorders. Individuals with these disorders often appear dramatic, emotional, or erratic. Cluster C includes Avoidant, Dependent, and Obsessive–Compulsive personal-

ity disorders. Individuals with these disorders often appear anxious or fearful. DSM–IV–TR at 685–86.

workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; and interact appropriately with the general public. The following activities were identified as being seriously limited but not precluded: understand and remember very short and simple instructions; make simple work-related decisions; be aware of normal hazards and take appropriate precautions; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and, use public transportation. Tr. at 498–99. The doctor concluded the form by writing, in long hand, that Plaintiff's illnesses "... would make it impossible working at a regular job on a sustained basis." Tr. at 499.

On March 11, 2014, Nurse Blackledge completed a residual functional capacity form. Tr. at 549–51. The answers to the questions make it clear that the nurse was merely stating what Plaintiff had reported to her.

On March 12, 2014, Plaintiff saw Dr. Dasari. Tr. at 609–12. At the conclusion of the office note, the doctor wrote: "Will assist with disability. Will write another letter re severity of [symptoms], refractory nature despite polypharmacy and therapy." Tr. at 612. In the letter, the doctor made reference to his previous opinion, and stated that despite polypharmacy, Plaintiff still struggles significantly with obsessions and compulsions. The doctor wrote that there had been no change in Plaintiff's symptoms and none was anticipated. The doctor wrote: "He would not be able to complete simple tasks, and would have decompensation and would miss more than 50% of his work/job. In my professional opinion, he is permanently disabled." Tr. at 553.

Dr. Dasari and Ms. Anderson, saw Plaintiff approximately once a month throughout 2013 and 2014. Tr. at 555–728. These documents were not submitted for consideration by the ALJ (Tr. at 28–32 showing the exhibits considered by the ALJ), rather they were submitted to and considered by the Appeals Council (Tr. at 4). Each of those treatment records contains a history, mental status examination and multiaxial diagnosis.

## ADMINISTRATIVE DECISION

In his decision, the ALJ wrote that he considered Dr. Dasari's opinion but gave it little weight for the following reasons: 1) Dr. Dasari's opinion was contradicted by the opinion rendered by Dr. Martin; 2) Dr. Dasari referenced no specific mental status examination findings in support of his opinions; 3) Dr. Dasari stated that Plaintiff's symptoms would persist despite medication and therapy, but failed to acknowledge Plaintiff's documented, habitual noncompliance; 4) the "fill in a blank," or "check off a box" forms are entitled to little weight in the adjudicative process. Tr. at 24

The ALJ gave great weight to the opinion of Dr. Martin and to the opinions expressed by the State Agency medical consultants. Tr. at 24–25. The relevant State Agency medical consultants are Beverly Westra, Ph.D., who rendered an opinion on December 3, 2012 (Tr. at 107), and Russell Lark, Ph.D., who rendered an opinion on February 12, 2013 (Tr. at 126). Both psychologists relied heavily on Dr. Martin's report to support their assessments of Plaintiff's mental residual functional capacity.

## DISCUSSION

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a

whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola* [*v. Astrue* ], 480 F.3d [885] at 886 [ (8th Cir.2007) ] ). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) In *Brand v. Secretary of Dept. of Health, Education and Welfare*, 623 F.2d 523, 527 (8th Cir.1980), Chief Judge Lay wrote that *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) is "the guideline for the evaluation of the standard of review." In *Universal Camera*, the Court wrote:

> We conclude, therefore, that the Administrative Procedure Act and the Taft–Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

■ *Id.*, 340 U.S. at 490, 71 S.Ct. 456. In reviewing disability decisions from the Social Security Administration, the Court sits in an appellate capacity and is responsible for giving the agency decision a scrutinizing analysis. This requires the Court to determine the substantiality of the evidence by determining if the ultimate decision is supported by substantial evidence on the record as a whole. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987). In *Gavin*, the Court wrote:

> In the review of an administrative decision, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory. It follows that the only way a reviewing court can determine if the entire record was taken into consideration is for the district court to evaluate in detail the evidence it use in making its decision and how any contradictory evidence balances out.

*Id.* (internal citations and quotations omitted).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

The most important issue in any disability case which proceeds beyond step three of the sequential evaluation is that of residual functional capacity:

> Probably the most important issue will be the question of [residual functional capacity].... The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.

*McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en banc).

■ Plaintiff argues that the final decision of the Commissioner is not supported by substantial evidence. Specifically he argues: 1) The RFC allows for only occasional reaching overhead, and must not be exposed to hazards, but that the jobs cited by the ALJ require frequent reaching and exposure to hazards; 2) the ALJ failed to give proper weight to the opinion of the treating physician.

■ This Court agrees that the ALJ's residual functional capacity finding is not supported by substantial evidence on the record as a whole. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir.1998). In *Papesh v. Colvin,* 786 F.3d 1126, 1132 (8th Cir.2015), the Court wrote that the regulations and case law *require* an ALJ to give "controlling weight" to the opinion of the treating physician *if* that opinion is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* quoting *Wagner v. Astrue,* 499 F.3d 842, 848–49 (8th Cir. 2007). The Court also cited Social Security Ruling 96–2p to explain that "Not inconsistent ... is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence ... as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion."

In *Forehand v. Barnhart,* 364 F.3d 984, 986 (8th Cir.2004), the Court, quoting *Kelley v. Callahan,* 133 F.3d at 589, wrote: "A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical or diagnostic data." The Court went on to note that the opinion letter provided by Forehand's physician was only a part of a larger record that fully supported the opinion. Thus, it was error for the ALJ to disregard the opinion of the treating physician. *Id.* at 988.

In support of her argument that the ALJ properly discounted Dr. Dasari's opinion, the Commissioner cites *Hogan v. Apfel,* 239 F.3d 958 (8th Cir.2001). In that case, the Court wrote: "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.* at 961. The Court noted that none of the restrictions set forth by Hogan's physician appeared elsewhere in his treatment records. Furthermore, the ALJ noted that the physician repeatedly described Hogan's condition as "mild," and controlled by medication. *Id.* In the case at bar, on the other hand, Dr. Dasari's office notes describe Plaintiff's illness as severe, and he consistently assesses Plain-

tiff global assessment of functioning in the mid 40s, indicating serious symptoms and impairments. See Footnote 2, above. Contrary to the Commissioner's argument, each of Dr. Dasari's office notes records his mental status examination and multi-axial diagnosis. Having reviewed the doctor's office notes, it is the opinion of this Court that Dr. Dasari's opinion is well supported by his clinical data and diagnostic techniques, and should have been afforded controlling weight.

As stated above, the ALJ did not have the opportunity to review the bulk of Dr. Dasari's treatment notes and the notes of the therapist at the doctor's clinic. Those records were submitted to the Appeals Council and entered into the record of this case. Nevertheless, the Appeals Council declined to review the ALJ's decision. In *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir.2000), the Court wrote that when the Appeals Council denies review of an ALJ's decision after receiving new and material evidence, the reviewing court must determine whether the record as a whole, including the new and material evidence, supports the ALJ's determination.

In *Jenkins v. Apfel*, 196 F.3d 922 (8th Cir.1999), new and material evidence was submitted to the Appeals Council after an ALJ had denied the claim. The Court, at 924, wrote: "Evaluating such evidence requires us to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing." Citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir.1994). The evidence submitted to the Appeals Council supported a finding that Jenkins had less residual functional capacity than the ALJ had found. *Id.* The Court held that if the ALJ had possessed the evidence considered by the Appeals Council, he would have approved Jenkins' claim. "Any other conclusion would have lacked the support

of substantial evidence on the record as a whole." *Id.* at 926.

In the case at bar, the ALJ's concerns about the deficiencies in Dr. Darsari's letters would have been resolved in Plaintiff's favor if the treatment records would have been before him. In particular, both Dr. Dasari and his colleague Ms. Anderson, assessed Plaintiff's mental status during each of their monthly treatment sessions. Dr. Darsari, both in his reports and in his treatment notes, was very clear that Plaintiff's mental impairments render him unable to work. As in the *Jenkins* case, it is clear to this Court that had the ALJ been afforded the opportunity to examine the voluminous treatment notes, he would have issued a fully favorable decision.

Before concluding this opinion, the Court notes that it, like the ALJ, was initially concerned with Plaintiff's apparent noncompliance with his prescribed medical treatment. However, after he began seeing Dr. Dasari, that noncompliance seems to have vanished. The Court attributes this to the doctor-patient relationship established between Plaintiff and the physician who is a specialist in the treatment of mental impairments.

In the opinion of the Court, Plaintiff has proved his case with medical evidence. The Commissioner's final decision that Plaintiff is not disabled is not supported by substantial evidence on the record as a whole and must be reversed.

## CONCLUSION AND DECISION

■ The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing test noted in *Gavin v. Heckler*, 811 F.2d at 1199, and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole

and is based on legal error. This case is reversed and remanded for an award of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).[4] *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa July 15, 2005).

IT IS SO ORDERED.

---

4. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."